

# COURT OF APPEALS
**SECOND DISTRICT OF TEXAS**
**FORT WORTH**

## NO. 02-11-00421-CV

IN THE INTEREST OF K.R.G., A
CHILD

----------

FROM THE 323RD DISTRICT COURT OF TARRANT COUNTY

----------

## MEMORANDUM OPINION[1]

----------

In two related issues, appellant K.M. (Mother) appeals the trial court's order terminating her parental rights to her son, K.R.G. (Kevin).[2]  She contends that the evidence is legally and factually insufficient to prove that termination is in Kevin's best interest.  We affirm.

---

[1]*See* Tex. R. App. P. 47.4.

[2]Throughout this opinion, we will use "Kevin" as an alias to refer to K.R.G., and we will use other aliases to refer to Kevin's family members.  *See* Tex. R. App. P. 9.8(b)(2).

## Background Facts

Mother was born in April 1959; she was fifty-two years old at the time of Kevin's termination trial in September 2011. Kevin is not Mother's first child; Mother birthed a daughter, Amber, in 1981. Mother raised Amber until she was approximately five years old, when Amber began living with Mother's sister, Kara, because Mother was addicted to cocaine. Amber never lived with Mother again.[3] Mother did not give money to Kara to support Amber.

In 1996, Mother gave birth to a son, Adam. Mother cared for Adam until he was two years old, but then Mother also gave him to Kara because Mother still had a drug problem and went off for a binge. Adam did not live with Mother again, and Mother did not support him financially.

Mother delivered her third child, Lindsay, in 1999. Upon her birth, Lindsay tested positive for cocaine and had syphilis, so she spent eleven days in neonatal intensive care. Because of the intervention of Child Protective Services (CPS), Kara has raised Lindsay since she was less than a month old. Mother never financially supported Lindsay.

In 2001, Mother birthed her fourth child, Kaden. Mother refused to allow the hospital to test Kaden for drugs upon his birth. Mother raised him until he was five months old, when she left him in a daycare and did not come back for

---

[3]Kara testified that she and Mother had been living together with Amber but that one day when Amber was in the first grade, Mother "just didn't come back home." Amber stayed with Kara until Amber was eighteen years old.

him.  Mother told CPS at that time that she did not come back for Kaden because she had been locked in a hotel room by a man and had been raped.  After being left in the daycare, Kaden began living with Kara and his siblings.  For a limited period of time, Mother financially supported Kaden, but she stopped doing so when Kara received managing conservatorship of him.

Kara adopted each of Mother's first four children.  Mother delivered Kevin, her fifth child, in September 2003.  Mother refused to take a drug test upon Kevin's birth.  CPS removed him, but after Mother received treatment for her drug use and participated in services offered by CPS, she regained possession of him when he was nine months old.  According to Mother, from 2004 until 2010, when she had continuous possession of Kevin, she stayed drug-free.

Nicole Webber, a CPS investigator, received a referral in September 2010 that Kevin had been wandering around his apartment complex and that Mother had been using drugs.  Webber visited Mother, who refuted these allegations, denied having a CPS history, and said that Kevin was her only child.  Webber gave Mother a portable drug test, and although Mother tested positive for cocaine, she still denied that she had been using drugs.  Webber and Mother picked up Kevin from school and took him to CPS's office.  Once they got there, Mother admitted to having other children and conceded that she had an extensive drug history.  Mother told Webber that she had used drugs twice in the month before Webber met with her.  Webber advised Mother to seek drug treatment programs, and Mother said that she would be willing to do so.

3

Upon meeting with Webber, Mother agreed to allow Kevin to live with Kara (and Kara's husband), like each of his four siblings had. Between September 2010 and December 2010, Webber and Mother spoke to each other on the phone, and Webber told Mother that she was expected to participate in drug treatment. Mother received counseling at Safe Haven Arlington Resource Center (Safe Haven) in October 2010 and went there again sporadically over the course of the following months. She also attended Celebrate Recovery, a Christian-based substance abuse support group, once in October 2010 and twice after that. Mother testified that she could not go to Celebrate Recovery regularly because the group met on Monday nights, a time when she sometimes worked.

From September 2010 to January 2011, Kara took Kevin to see Mother periodically. According to Kara, Mother provided a total of $200 to $300 of support for Kevin from September 2010 until January 2011, but she did not support him after that. Mother said that she provided support of about $200 per month for three months until she became unemployed in December 2010.

In November 2010, the Department of Family and Protective Services (the Department) filed a petition to seek termination of Mother's parental rights to Kevin if her reunification with him could not be achieved. The trial court named the Department as Kevin's temporary managing conservator and appointed an attorney ad litem to represent him.

The Department initially planned to reunify Kevin with Mother. To progress that goal, it filed a service plan in February 2011. Mother testified that she

4

received the service plan in March 2011.[4]  Mother did not comply with various aspects of the service plan, and the Department's goal eventually changed from reunification to termination.  The trial court heard evidence on the Department's termination petition in September 2011.  At the end of the trial, the court terminated Mother's parental rights to Kevin, finding that termination was in Kevin's best interest and that Mother had endangered him and had constructively abandoned him.[5]  Mother brought this appeal.

## Kevin's Best Interest

In her two issues, Mother challenges the legal and factual sufficiency of the evidence to prove that termination of her parental rights to Kevin is in his best interest.

**Standard of review and applicable law**

A parent's rights to "the companionship, care, custody, and management" of his or her children are constitutional interests "far more precious than any property right."  *Santosky v. Kramer*, 455 U.S. 745, 758–59, 102 S. Ct. 1388, 1397 (1982); *In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003).  "While parental rights are of constitutional magnitude, they are not absolute.  Just as it is imperative for

---

[4]Mother had been to five individual counseling sessions before receiving her service plan.

[5]Mother does not challenge the trial court's endangerment or constructive abandonment findings under family code section 161.001(1)(D), (E), and (N).  *See* Tex. Fam. Code Ann. § 161.001(1)(D), (E), (N) (West Supp. 2011).  The trial court also terminated the parental rights to Kevin of K.G. (Father), who is not a party to this appeal.

courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right." *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002). In a termination case, the State seeks not just to limit parental rights but to erase them permanently—to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except for the child's right to inherit. Tex. Fam. Code Ann. § 161.206(b) (West 2008); *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). We strictly scrutinize termination proceedings in favor of the parent. *Holick*, 685 S.W.2d at 20–21; *In re R.R.*, 294 S.W.3d 213, 233 (Tex. App.—Fort Worth 2009, no pet.).

In proceedings to terminate the parent-child relationship brought under section 161.001 of the family code, the petitioner must prove by clear and convincing evidence that termination is in the best interest of the child. Tex. Fam. Code Ann. § 161.001(2). Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 101.007 (West 2008). Due process demands this heightened standard because termination results in permanent, irrevocable changes for the parent and child. *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002).

In evaluating the evidence for legal sufficiency in parental termination cases, we determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that the grounds for termination were

6

proven. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). We review all the evidence in the light most favorable to the finding and judgment. *Id.* We resolve any disputed facts in favor of the finding if a reasonable factfinder could have done so. *Id.* We disregard all evidence that a reasonable factfinder could have disbelieved. *Id.* We consider undisputed evidence even if it is contrary to the finding. *Id.* That is, we consider evidence favorable to termination if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *Id.* We cannot weigh witness credibility issues that depend on the appearance and demeanor of the witnesses, for that is the factfinder's province. *Id.* at 573–74. And even when credibility issues appear in the appellate record, we defer to the factfinder's determinations as long as they are not unreasonable. *Id.* at 573.

In reviewing the evidence for factual sufficiency, we give due deference to the factfinder's findings and do not supplant the jury's verdict with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006); *see also In re L.M.I.*, 119 S.W.3d 707, 712 (Tex. 2003) (explaining that in a termination case, an appellate court should not reweigh disputed evidence or evidence that depends on witnesses' credibility), *cert. denied*, 541 U.S. 1043 (2004). We determine whether, on the entire record, a factfinder could reasonably form a firm conviction or belief of the grounds for termination. Tex. Fam. Code Ann. § 161.001; *C.H.,* 89 S.W.3d at 28. If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder

7

could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient. *H.R.M.*, 209 S.W.3d at 108.

There is a strong presumption that keeping a child with a parent is in the child's best interest. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006); *see also In re D.M.*, 58 S.W.3d 801, 814 (Tex. App.—Fort Worth 2001, no pet.) (explaining that the termination statute "should not be used to merely reallocate children to better and more prosperous parents"). Prompt and permanent placement of the child in a safe environment is also presumed to be in the child's best interest. Tex. Fam. Code Ann. § 263.307(a) (West 2008). Nonexclusive factors that the trier of fact in a termination case may use in determining the best interest of the child include the desires of the child, the emotional and physical needs of the child now and in the future, the emotional and physical danger to the child now and in the future, the parental abilities of the individuals seeking custody, the programs available to assist these individuals to promote the best interest of the child, the plans for the child by these individuals or by the agency seeking custody, the stability of the home or proposed placement, the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one, and any excuse for the acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976).

A factfinder may consider a parent's continuing use of illegal drugs as a factor affecting the best interest of a child. *See In re M.R.*, 243 S.W.3d 807, 820 (Tex. App.—Fort Worth 2007, no pet.); *In re S.B.*, 207 S.W.3d 877, 887 (Tex.

8

App.—Fort Worth 2006, no pet.). A parent's noncompliance with a service plan may also affect a factfinder's consideration of the child's best interest. *M.R.*, 243 S.W.3d at 821; *see also In re K.S.*, No. 02-09-00331-CV, 2010 WL 2432012, at *8 (Tex. App.—Fort Worth June 17, 2010, no pet.) (mem. op.) (noting that a mother had been "unwilling to cooperate with CPS and undertake the services that would return [the child] to her"). Finally, a parent's extensive criminal record reflects on the best interest of the child in maintaining a relationship with that parent. *See In re V.V.*, 349 S.W.3d 548, 558 (Tex. App.—Houston [1st Dist.] 2010, pet. denied) (en banc).

**Analysis**

**Mother's drug use and criminal behavior**

Mother started using cocaine when she was eighteen years old, and she became addicted to it in approximately 1986. From then until September 2010, Mother had not been able to stop using cocaine altogether even though, as Mother acknowledges in her brief, her history of abusing illegal drugs has disrupted her relationships with each of her five children. Mother's assessment form from her counseling at Phoenix Counseling and Education Centers (Phoenix) indicates that along with cocaine, Mother has also used marijuana and LSD in the past. The assessment form states that Mother has "attempted recovery several times and has relapsed each time." Mother admitted that she had used cocaine with Father.

9

Mother received treatment for her drug use in 2003 upon Kevin's removal from her care. Mother testified that she did not use drugs from Kevin's birth until September 2010 and that "[h]arassment from [Father]" was what caused her to relapse. Mother said that she had not used drugs from September 2010 until the trial a year later, and she testified that she would stay off of drugs because she "love[d] [Kevin] very much[,] and he deserve[d] for [her] to be clean and to do the right thing." Mother testified that while she was at a hospital in October 2010, she tested negative for drug use, and she also stated that she had passed a few random drug tests after Kevin's removal from her care in September 2010, including tests in October 2010 and March 2011.[6] Mother testified that she planned on maintaining a drug-free lifestyle; she said that she was learning from the mistakes that she had made.

The trial court could have been reasonably skeptical about Mother's claim to be drug-free from September 2010 until September 2011 because at a June 2011 hearing, the court ordered Mother to take a hair strand drug test, and although Mother's CPS caseworker, Elizabeth Cuevas, gave Mother information on how to take the test, Mother did not take it but instead went to Houston. *See In re W.E.C.*, 110 S.W.3d 231, 239 (Tex. App.—Fort Worth 2003, no pet.) (explaining that a factfinder may reasonably infer from a parent's failure to attend

---

[6]Mother did not present written documents establishing that she had passed these tests, and she did not call the people who she says gave her the tests to corroborate her testimony that she passed them.

scheduled drug screenings that the parent was avoiding testing because the parent was using drugs) (citing *D.M.*, 58 S.W.3d at 813). According to Cuevas, when Mother returned from Houston, Cuevas told Mother that Cuevas would again arrange for Mother to take the hair strand drug test, but Mother still did not take it.[7] Cuevas admitted that Mother passed an oral swab drug test in July 2011.

Even if the trial court believed that Mother had not used drugs since September 2010, the court still could have reasonably doubted that Mother, whose history of using illegal drugs, stopping her use of them, and relapsing had spanned more than thirty years, would be able to maintain a drug-free lifestyle for the rest of Kevin's childhood if he was returned to her. *See In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009) (stating that "evidence of improved conduct, especially of short-duration, does not . . . negate the probative value of a long history of drug use and irresponsible choices"); *In re Z.C.*, 280 S.W.3d 470, 476 (Tex. App.—Fort Worth 2009, pet. denied) (concluding that a father's efforts to "improve his ability to effectively parent on the eve of trial [were] not enough to overcome a decade of poor parenting"); *In re R.W.*, 129 S.W.3d 732, 741 (Tex. App.—Fort Worth 2004, pet. denied) ("[T]he jury was not required to ignore a long history of dependency and destructive behavior merely because it allegedly abated before trial."). When Mother was asked whether she had done her best

---

[7]Mother testified that she was not asked to take a hair strand drug test when she came back from Houston.

to demonstrate that she had defeated her cocaine addiction, she replied, "No. I probably should have just checked myself into treatment."

Along with her lengthy history of substance abuse, Mother also has an extensive criminal history. She has been charged six times with prostitution and once for possessing a controlled substance. Mother was most recently arrested for prostitution in 2006, when Kevin was two years old, and upon her conviction, she spent 150 days in state jail. Father cared for Kevin while Mother was in jail. Mother said that Father was abusive toward her, and she admitted that by going to jail for prostitution, she left Kevin with an abusive man.[8]

**Mother's compliance with the service plan and her acts during the pendency of the Department's case that relate to the propriety of her relationship with Kevin**

The service plan required Mother to have safe, stable housing; complete random drug tests; complete parenting classes, individual counseling, and counseling concerning domestic violence (at Safe Haven); and enroll in an inpatient drug program. Cuevas developed the service plan for Mother and met with her about the requirements of the plan in early 2011. Mother indicated to Cuevas that she understood the requirements of the service plan and was willing to achieve them.

---

[8]Mother and Father have never been married. After Mother got out of jail, she continued her relationship with Father, and he continued to abuse her. Mother eventually ended the relationship, and at the time of the trial, she had not seen him in more than a year and did not know how to locate him. CPS could not locate him either.

12

Mother was not employed at the time of the trial. She had worked for Salvation Army in November and December 2010 and had worked for two weeks as a telemarketer in March 2011.[9] She said that she had diligently searched for employment since then; although she had received offers to work at a tobacco shop and two restaurants, she did not believe that working at those locations were conducive to her drug abuse recovery. Mother did not own a car, and she testified that her lack of transportation was a factor in her inability to seek employment and to comply with the service plan.[10] Mother had been renting and living in a townhome in Arlington, as part of section eight housing, for two years. She was paying rent of less than $200 per month through money that she had saved and had kept at her residence from working at her Salvation Army and telemarketing jobs. Mother received food by going to food banks along with buying some fruit and vegetables from a store. But Mother's savings had been depleted, and she only had $40 to $60 remaining at the time of the trial. It is therefore unclear how Mother planned on providing shelter and food (beyond what she could get at food banks or through food stamps) for Kevin if the trial court returned him to her. Mother testified that she had applied to receive social

---

[9]Between 2004 and 2010, when Kevin was removed from Mother's care, she worked for a clothing store for two years and for a daycare for two years. She left the job with the clothing store because of panic attacks.

[10]Mother testified that a couple of months before the trial, she had pooled money with some friends to buy a car but that one of the friends had "[taken] off with" the car.

security disability income and was "waiting for them to get back with [her] for an appointment."

As we mentioned above, Mother did not complete a drug test that the trial court ordered her to take and that the Department arranged for her. She therefore violated that part of the service plan.

Mother started the eight-week domestic violence counseling at Safe Haven in July 2011 and completed the counseling a few weeks before the trial began. Mother also went to some individual counseling in August 2011, but she did not complete it and did not go to it in the month that the trial occurred. Mother did not go to an inpatient treatment drug program that the Department recommended for her; she said that she could not do so because she needed to work or to look for employment. Mother went to Phoenix for an outpatient drug treatment program in March 2011 but was released from the program for not attending it.[11] She started that program again in July 2011, but Cuevas indicated that Mother had not completed the program at the time of the trial, and the evidence shows that she did not appear for two scheduled sessions in late August 2011.

According to Cuevas, in February 2011, Mother told Cuevas that Mother was attending Narcotics Anonymous (NA),[12] but Mother never provided sign-in

---

[11]A counselor at Phoenix wrote a letter that stated that Mother had attended individual and group counseling there but had been "discharged from [the] program on 5/17/11 due to excessive absences."

[12]Mother testified at trial that she began attending NA on June 29, 2011.

14

sheets to Cuevas to prove that she was attending NA during that time, and although Mother gave Cuevas the number for her NA sponsor, Cuevas was unable to make contact with him. The trial court admitted exhibits showing that Mother had attended eleven NA meetings from June 29, 2011 until September 7, 2011.

Mother did not complete the parenting classes that the service plan required, but some of the topics at Safe Haven concerned aspects of parenting. Cuevas testified that the State did not pay for the parenting classes, so Cuevas advised Mother to take the classes online, but Mother did not have an internet connection at her house.

Cuevas testified that throughout the Department's case, contacting Mother was difficult. From March 2011 until June 2011 at a hearing, Cuevas could not contact Mother, and Mother did not attend visits with Kevin during that time. In fact, Cuevas indicated that although Mother could have had weekly visitation with Kevin, she did not visit him from January 2011 until July 2011. And from July 2011 until the trial in September 2011, she visited him only three times although CPS had set up more visits and had brought Kevin to visits that Mother did not attend. Mother did not explain to Cuevas why she had missed the visits, and on one occasion, although Mother told Cuevas that she was coming to a visit the night before the visit was scheduled, Mother still did not appear, and she did not contact Cuevas to tell her that she was not going to appear. Mother said that her lack of transportation and "the heat" (because she was walking) prevented

15

her from attending some of the visits with Kevin that CPS had set up. She explained that she was getting "extremely sunburned and was fainting a lot." During one of Kevin's visits with Mother, Mother gave Kevin food and played with him, but Cuevas noticed that Mother was ready for the visit to end before her time with Kevin expired.

In May 2011, Cuevas attempted to visit Mother's home, but when Cuevas knocked on the door, a man answered and said that Mother was not there because Mother was "traveling the country." At the June 2011 hearing, Cuevas asked Mother where she had been, and Mother said that she had been "traveling with her new boyfriend," who was a truck driver, including spending some time in Michigan. Mother described her boyfriend as "very supportive," and she revealed that she planned to marry him in May 2012.

**Mother's relationship with Kevin, her plans for him, and the Department's plans for him**

Mother believed that Kevin had a strong bond with her and wanted to live with her. She recognized, however, that Kevin was safe, loved, provided for, and developing well while living with Kara, Kara's husband, and Mother's other four children that Kara and her husband had adopted. Mother conceded that Kevin was allowed to live with his brothers and sisters by staying with Kara. She also admitted that she had not acted fairly toward Kevin.

Cuevas conceded that Kevin has a bond with Mother and cares about her. She stated, however, that Kevin was doing well while living with Kara. Cuevas

stated that initially, Mother's other biological children in that home had a difficult time adjusting to Kevin being there, but she said that at the time of the trial, those children were "doing much better" and were getting along with Kevin. Kara explained that when Kevin began living with her, the other children in the home "were very angry that . . . this situation had come up again. They were upset that this would be another child that would need time and attention. . . . [Kevin] needed a lot of extra help with his school work." Kara said that she had been working "really hard" with Kevin on the school work and that he had been put in a special program in school for working on language arts and reading.

Kara wanted to keep Kevin in her home permanently and possibly adopt him, just as she had adopted each of Mother's other children. Cuevas believed that if Kevin continued to live with Kara, he could mature into a responsible adult. Kara said that she could provide a safe and loving environment for Kevin. She stated that she would not treat Kevin differently from the other children in her house, and she believed that Kevin had "every right to be successful, to pursue his interests and be the wonderful human being that [he] can be." Kara testified that Kevin enjoyed going to church with Kaden, his brother. She conceded that Kevin had initially hoped that Mother could "get well and take care of him," but Kara indicated that Kevin later began to talk about aspects of continuing to live with her and his siblings.

When the Department's attorney asked Cuevas why she thought termination was in Kevin's best interest, Cuevas said that Kevin needed

consistency and permanency that and he was not likely to get that with Mother because of her drug use and criminal history.  Cuevas did not believe that Mother was serious about making a lifestyle change.  Kara testified that she would be concerned about returning Kevin to Mother because

> [t]he same issues have occurred with five children over a 29-year history.  And I think [Mother] is  trying to get better, but I feel like she didn't really make an effort in [Kevin's] case once she was given her service plan until . . . we were going to talk about what to do with [Kevin].  And it wasn't until I said, ["]Hey, we're going to court, and . . . your rights are . . . about to be terminated[,"] that she really woke up and started doing things.  And, you know, she's 52 years old.  It's time she started doing these things on her own.

**The trial court's determination of Kevin's best interest**

Although the evidence indicated that Kevin did not desire for Mother's parental rights to be terminated, the trial court could have nonetheless determined that termination was in his best interest.  *See Phillips v. Tex. Dep't of Protective & Regulatory Servs.*, 25 S.W.3d 348, 356 (Tex. App.—Austin 2000, no pet.) (upholding a trial court's decision that termination was in the best interest of children despite the termination being against the children's wishes because "[w]hat children want . . . is not always in their best interests").  As we explained above, the trial court could have reasonably doubted Mother's long-term ability to remain drug-free and to refrain from criminal activities that would disrupt Kevin's stability.  *See In re S.D.*, 980 S.W.2d 758, 763 (Tex. App.—San Antonio 1998, pet. denied) (explaining that conduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of the child).

18

The evidence showed that Kevin particularly needed stability because, among other reasons, he was behind where he needed to be educationally; at the end of first grade, he was reading at a prekindergarten level. Kara testified that she was working hard to improve that area of Kevin's development, and the trial court could have reasonably found that Mother's history of returning to drug use and abandoning her children would have risked that improvement if Kevin had been returned to her. The evidence summarized above presents significant doubts about Mother's parental abilities (as inferred, in part, from Mother's drug use, her criminal acts, and her failure to consistently visit Kevin or maintain contact with CPS during the pendency of the Department's case) but does not present any doubts concerning Kara's parental abilities and the stability that Kevin received in her home. And although the Department made programs available to Mother that might have allowed her to be reunited with Kevin, as we explained above, she did not fully or consistently take advantage of those programs.

Thus, although the evidence presents a close case, we conclude that the trial court could have reasonably formed a firm conviction or belief that termination of Mother's parental rights is in Kevin's best interest, and we therefore hold that the evidence is legally and factually sufficient to support the trial court's judgment of termination. *See J.P.B.*, 180 S.W.3d at 573; *C.H.*, 89 S.W.3d at 28. We overrule Mother's two issues.

**Conclusion**

Having overruled Mother's issues, we affirm the trial court's judgment.

TERRIE LIVINGSTON
CHIEF JUSTICE

PANEL:  LIVINGSTON, C.J.; MCCOY and MEIER, JJ.

DELIVERED:  May 17, 2012